In the Matter of the CIVIL
COMMITMENT OF Elliott
CARROLL.

No. A05–1019.

Court of Appeals of Minnesota.

Dec. 6, 2005.

Donald R. Betzold, Brooklyn Center, MN, for appellant Carroll.

Amy Klobuchar, Hennepin County Attorney, Carolyn A. Peterson, Assistant County Attorney, Minneapolis, MN, for respondent petitioner.

Considered and decided by TOUSSAINT, Chief Judge; KALITOWSKI, Judge; and MINGE, Judge.

## OPINION

TOUSSAINT, Chief Judge.

The district court committed appellant Elliott Carroll to the Minnesota Security Hospital for an indeterminate period as mentally ill and dangerous. On appeal, he argues that he did not commit an overt act causing or attempting to cause serious physical harm to another and that the 60–day treatment report was not proper because it was not prepared by a member of his treatment team. Because Carroll engaged in overt acts causing or attempting to cause serious physical harm to others, and because the head of the treatment facility properly delegated the task of preparing the treatment report, we affirm.

## FACTS

Carroll, born in 1971, has a history of psychiatric treatment that began in 1991. Since then, he has been repeatedly committed as mentally ill, followed by provisional discharges that were revoked or by new petitions for commitment as mentally ill. Upon release from confinement, he has had a pattern of stopping his medication, consuming alcohol or street drugs, and engaging in threats or assaultive behavior.

Carroll was most recently recommitted as mentally ill in November 2003, and he agreed to the order extending authorization for administration of neuroleptic medication. He was provisionally discharged on November 5, 2003, but, after he failed to take his medication and threatened to kill his sister, his provisional discharge was revoked on September 2, 2004. On September 23, 2004, he was again provisionally discharged. On October 18, 2004, case-management staff visited Carroll's apartment and observed broken windows; Carroll also threatened a juvenile female, whom he had accused of stealing money. Carroll's sister received reports of these difficulties. She called his nurse and also asked the police to check his condition. The police brought him to a crisis center.

On October 19, 2004, while at the crisis center, Carroll assaulted two mental-health workers after his repeated requests to smoke had been denied. He first hit a mental-health worker in the eye. After calling for security, a senior psychiatric social worker grabbed a cushion to put between Carroll and the other worker; he then used the cushion to block a chair that Carroll had picked up. Carroll hit the mental-health worker again in the mouth and nose, causing him to crumple to the floor and to require treatment in an emer-

gency room. Carroll then punched the social worker in the left temple with a closed fist, knocking his glasses off. Security arrived, and Carroll was secluded, restrained, and given emergency medications. A petition for his commitment as mentally ill and dangerous was filed.

A staff psychiatrist at the Hennepin County Medical Center (HCMC) diagnosed Carroll with schizophrenia. He noted that Carroll has a longstanding history of aggression when refused a cigarette, money, or other things he requests. Besides the recent incidents in the hospital, the HCMC psychiatrist noted that Carroll assaulted a doctor and a nurse in Anoka in 2000 when he was not allowed to have a cigarette. He assaulted his sister when he wanted money from her, and he assaulted and threatened others. Carroll also attacked his mother with a board and, in another incident, assaulted her. The HCMC psychiatrist noted that he himself had been assaulted in 1998 by Carroll, who threw a food tray at him, bruising his jaw, when he refused Carroll's request for a pass.

The HCMC psychiatrist testified that Carroll had engaged in acts capable of causing serious physical harm to others. The injury to the mental-health worker could have been substantial, ranging from a hemorrhage on the retina to a detached retina. Carroll's blow to the HCMC psychiatrist in 1998 was hard enough that it could have fractured a jaw. Carroll's attacks on his mother resulted in lacerations. His assault on the nurse in Anoka broke her glasses, resulting in lacerations, and the physician whom Carroll assaulted was seen in the emergency room. The HCMC psychiatrist found a very high likelihood that Carroll would continue to engage in acts capable of creating a serious risk of harm to others and recommended his commitment to the Minnesota Security Hospital.

A court-appointed examiner diagnosed Carroll with schizoaffective disorder and supported his commitment as mentally ill and dangerous. Carroll's sister testified that she believes that treatment for mental illness and chemical dependency is necessary, but she does not believe that he poses a danger to the public by his assaultive behavior.

The district court committed Carroll to the Minnesota Security Hospital as mentally ill and dangerous, and a review hearing was held. A psychologist employed by the State Operative Forensic Service (SOFS) testified. After conducting interviews with Carroll, reviewing his records, and holding discussions with staff, the psychologist prepared the 60–day treatment report submitted by the security hospital. In analyzing Carroll's dangerousness, the psychologist testified that the most significant factors were Carroll's history of aggressive behavior, substance abuse, lack of appreciation of his behavior, and lack of remorse. He recommended continued treatment at the Minnesota Security Hospital.

The SOFS psychologist also testified that, although he wrote the treatment report, he is not a member of Carroll's treatment team and did not participate in the treatment program. He is employed not by the security hospital, but by SOFS, which specializes in evaluations of mentally ill and dangerous commitments, competency to stand trial, and criminal responsibility. The psychologist explained that a treatment psychologist and psychiatrist and an evaluation psychologist and psychiatrist perform separate functions and that it is unethical to treat a person and then provide the forensic opinion. Carroll moved to disallow the psychologist's report as improper under the statute because it

was not prepared by his treatment team. The district court denied the motion.

Carroll's sister testified that, if Carroll were committed only as mentally ill, he could live with her after he was released. She was not concerned that he was dangerous, did not believe he had a mental illness, and did not believe that the medication was curing any mental illness. Carroll testified that he does not want to be at the hospital, but he accepts that he has an illness and needs medications.

The district court made Carroll's commitment as mentally ill and dangerous indeterminate, and this appeal followed.

### ISSUES

I. Did Carroll engage in an overt act causing or attempting to cause serious physical harm to another, as required for commitment as mentally ill and dangerous under Minn.Stat. § 253B.02, subd. 17 (2004)?

II. Was the 60–day treatment report improper because it was not prepared by a member of Carroll's treatment team?

### ANALYSIS

#### I.

On appeal, this court will examine whether the commitment is justified by the findings based on the evidence at the hearing. *In re Knops,* 536 N.W.2d 616, 620 (Minn.1995). "The record is viewed in the light most favorable to the trial court's decision." *Id.* (citation omitted). Findings of fact will not be set aside unless clearly erroneous, with due regard given to the court's judgment of the credibility of the witnesses. *Id.;* Minn. R. Civ. P. 52.01. Whether the evidence is sufficient to support a finding that an overt act has occurred is a legal question subject to de novo review. *Knops,* 536 N.W.2d at 620.

To commit a person as mentally ill and dangerous, the district court must find by clear and convincing evidence that the person is mentally ill and that

> as a result of that mental·illness presents a clear danger to the safety of others as demonstrated by the facts that (i) *the person has engaged in an overt act causing or attempting to cause serious physical harm to another* and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another.

Minn.Stat. § 253B.02, subd. 17 (2004) (emphasis added). These statutory requirements are interpreted strictly. *Knops,* 536 N.W.2d at 620.

The supreme court has cautioned that courts must pay due respect to the difference between the less-serious conduct required for commitment as mentally ill and the more-serious conduct required for indeterminate commitment as mentally ill and dangerous. *In re Kottke,* 433 N.W.2d 881, 884 (Minn.1988). Commitment as mentally ill requires a showing only of "a substantial likelihood of *physical harm* to self or others," as demonstrated by a failure to obtain necessities or "a recent attempt or threat to physically harm self or others." Minn.Stat. § 253B.02, subd. 13(a), (3) (emphasis added). In contrast, commitment as mentally ill and dangerous requires a showing of "a clear danger to the safety of others," as demonstrated by a showing that "the person has engaged in an overt act causing or attempting to cause *serious physical harm* to another," and is substantially likely to do so in the future. Minn.Stat. § 253B.02, subd. 17(b) (emphasis added). The person's intent or the outcome of the action is not relevant to the determination of whether the conduct meets the overt-act requirement. *In re Jasmer,* 447 N.W.2d 192, 195–

96 (Minn.1989). Further, it is not necessary that "mayhem or murder" occur, and less violent conduct may meet the statutory requirement. *Kottke,* 433 N.W.2d at 884.

The district court found that Carroll was diagnosed with schizophrenia. It ruled that Carroll presented a clear danger to the safety of others, as demonstrated by the fact that he engaged in overt acts causing or attempting to cause physical harm to another, based on the October 18, 2004, unprovoked assaults and the altercation at his apartment with a juvenile female, in which he accused her of stealing his money, along with his history of violent behavior. Finally, the district court ruled that Carroll was rated as being very likely to be dangerous in the future.

■ Carroll argues only that the assaults did not constitute overt acts causing or attempting to cause serious physical harm to another. He contends that he merely lifted a chair and put it down and struck two staff members, neither of whom suffered personal injury. He asserts that his conduct did not inflict and was not intended to inflict serious physical harm of the type contemplated by the statute. Further, he argues that other assaults referred to in the record should be given limited evidentiary weight because of the limited information available and their remoteness in time.

In *Kottke,* the supreme court ruled that Kottke's "conduct, intolerable as it was, neither inflicted nor was intended to inflict the serious physical harm of the type contemplated by the statute." *Kottke,* 433 N.W.2d at 884. On two occasions, Kottke had struck security personnel, once leaving red knuckle marks and once causing the person to fall and sprain a thumb. *Id.* at 882. Kottke was described as "extremely mild-mannered," and his assaults were described as striking out "in a rather ineffec-

tual way." *Id.* at 883. He had no history of similar behavior. *Id.*

In contrast, as the district court found, Carroll's records were "replete with documentation of violent outbursts and physical assaults, which he shows not the slightest interest or capability of managing," including the October 18, 2004, incident and the other incident already described. The district court found that the fact that Carroll "has not so far managed to inflict serious and permanent injuries upon any of his victims is a matter of luck and not for lack of intent." The findings as to the other assaults are supported by clear and convincing evidence.

*Kottke* is clearly distinguishable. Carroll's acts of violence against the hospital mental-health worker and the social worker, along with his history of violence, show that he committed overt acts causing or attempting to cause serious physical harm to another.

## II.

■ Minn.Stat. § 253B.18, subd. 2(a) (2004), provides that "a written treatment report shall be filed by the treatment facility." Carroll argues that the report prepared by a SOFS psychologist did not meet this requirement because the psychologist was not a member of Carroll's treatment team. But after Carroll's arrival at the Minnesota Security Hospital, he was "under the control and custody of the head of the treatment facility." Minn.Stat. § 253B.10, subd. 1 (2004). "Head of the treatment facility" is defined as "the person who is charged with overall responsibility for the professional program of care and treatment of the facility *or the person's designee.*" Minn.Stat. § 253B.02, subd. 8 (2004) (emphasis added). The SOFS psychologist was a designee; his preparation of Carroll's treatment report

did not violate Minn.Stat. § 253B.18, subd. 2(a).

## DECISION

The district court's decision committing Carroll for an indeterminate period as mentally ill and dangerous is affirmed. The district court properly considered a treatment report prepared by a designee of the head of the treatment facility.

**Affirmed.**