*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0529**


In re the Commitment of: Kevin J. Strong


**Filed September 6, 2016
Affirmed
Halbrooks, Judge**


St. Louis County District Court
File No. 69VI-PR-15-52

Todd E. Deal, Virginia, Minnesota (for appellant)

Mark S. Rubin, St. Louis County Attorney, Sharon Chadwick, Assistant County Attorney, Duluth, Minnesota (for respondent county)

Considered and decided by Halbrooks, Presiding Judge; Johnson, Judge; and Muehlberg, Judge.*

## UNPUBLISHED OPINION

**HALBROOKS**, Judge

Appellant challenges his indeterminate civil commitment, arguing that the district court erred by finding that he engaged in overt acts that caused or attempted to cause serious physical harm to others. We affirm.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

# FACTS

On May 14, 2015, respondent St. Louis County petitioned for civil commitment of appellant Kevin J. Strong as mentally ill and dangerous (MID) after concluding that Strong's delusional and disturbing sexual beliefs regarding children place his safety and the safety of others at risk. In support of its petition, the county offered (1) evidence of past incidents during which Strong engaged in overt acts causing or attempting to cause serious physical harm to another and (2) examples of Strong's religious ideations and fixations on young females.

The events on which the petition was based span the course of nearly a decade, beginning when Strong was 14 years old. On April 23, 2000, police apprehended him hiding inside a church along with another juvenile male. On July 4, 2008, Strong was apprehended after officers observed him throwing homemade incendiary devices into a crowd of people at a street dance. He was arrested for disorderly conduct. On July 22, 2008, officers arrested Strong after receiving complaints that he was "hitting on" young females and giving them homemade incendiary devices. Officers discovered child pornography contained on a flash drive he possessed at the time of arrest. Strong was convicted of felony possession of pornographic material. On October 2, 2008, officers apprehended Strong after he shot his mother several times with a high-caliber pellet gun. Strong was convicted of misdemeanor domestic assault.

Strong has seven felony convictions from 1999 to 2010, including two counts of first-degree criminal damage to property, third-degree burglary, possession of a dangerous weapon on school property, fifth-degree controlled-substance crime,

possession of pornographic work involving minors, and escape from custody. Strong's longest span without arrest was from July 2005 to July 2008. But during this period, Strong was enrolled in the military from March 2006 to February 2007 and under civil commitment from April to October 2007. Strong was again placed under civil commitment at MCF-Oak Park Heights in 2012 with a release date of September 2015.

Before his release from confinement at Oak Park Heights, the county recommended that Strong be committed as MID based on the "pattern of Mr. Strong's criminal history, his inability to be treated as a sex offender or for chemical dependency, and his continued verbalization involving the sacrifice of young girls and his sexual thoughts of them." The county was particularly concerned with the latter. Throughout his years in treatment, Strong continuously expressed a desire to sacrifice young females in the name of a religion he professes to have created called "Wistika." Strong believes that he is "ordained to perform sacrifices of young girls by having sexual intercourse with them and killing them." He has described the process of choosing female victims between the ages of 6 to 9 by bone size and vaginal depth and has weighed the merits of wrist-slitting versus blunt-force trauma to accomplish the killings. In addition, Strong urged his psychiatrist to deliver a letter to the judge in which he requests permission to sacrifice a girl in order to prove that his belief system is accurate.

Following a commitment hearing in August 2015, the district court granted the county's petition for civil commitment as an MID person. The district court found that Strong (1) had "engaged in at least one [overt] act causing or attempting to cause serious

physical harm to another" and (2) "poses a substantial likelihood of physical harm to himself or to others."

In January 2016, the district court held a final commitment hearing and determined that Strong continued to meet the criteria for an MID commitment. The district court found:

> Since his initial commitment, Respondent has not meaningfully participated in treatment to address his delusional beliefs and denies any need for treatment services. He was unable to identify possible triggers or high risk situations that might elicit heightened symptoms. He was unable to identify any family or community support systems which could provide pro-social personal support. He continues to express a view that non-prescribed mood-altering chemicals are for rejoicing and affirmed his intention to partake in the consumption of such substances when available to him, despite the fact that intoxication has played a role in many of his prior criminal offenses and is considered an ongoing risk factor for acting upon his delusional beliefs.

Based on these findings, the district court determined that there is a continued "substantial likelihood that [he] will engage in acts capable of inflicting serious harm to another" and committed Strong for an indeterminate period. This appeal follows.

## D E C I S I O N

Strong argues that the district court erred by committing him as MID, asserting that his actions, while criminal, do not qualify as overt acts for the purpose of commitment. A district court must order the commitment of a person as MID if it finds by clear and convincing evidence that the person satisfies the statutory definition. Minn. Stat. § 253B.18, subd. 1(a) (2014). An MID person is a person:

> (1) who is mentally ill; and

4

(2) who as a result of that mental illness presents a clear danger to the safety of others as demonstrated by the facts that (i) the person has engaged in an overt act causing or attempting to cause serious physical harm to another and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another.

Minn. Stat. § 253B.02, subd. 17(a) (2014). This court reviews a district court's civil-commitment decision to determine whether the district court complied with the statute and whether the evidence in the record supports the findings of fact. *In re Knops*, 536 N.W.2d 616, 620 (Minn. 1995). The record is viewed in the light most favorable to the district court's decision and findings of fact shall not be set aside unless clearly erroneous. *Id.* But this court "review[s] de novo whether there is clear and convincing evidence in the record to support the district court's conclusion that appellant meets the standards for commitment." *In re Thulin*, 660 N.W.2d 140, 144 (Minn. App. 2003).

Strong concedes that he is mentally ill and "has evidenced a flawed perception of reality." He challenges only the district court's determination that he is dangerous. The district court concluded that there is clear and convincing evidence that, as a result of his mental illness, Strong presents a clear danger to the safety of others "as demonstrated by his having engaged in at least one overt act causing or attempting to cause serious physical harm to another." In determining whether a person's act was intended to inflict "serious physical harm" so as to support that person's commitment as MID, the word "serious" is given its common understanding. *In re Kottke*, 433 N.W.2d 881, 884 (Minn. 1988); *see also* Minn. Stat. § 253B.02, subd. 17(a). Thus, while an act that results in a physical affront does not necessarily meet the requirement of attempting to cause serious

5

physical harm to another, *Kottke*, 433 N.W.2d at 884, it is not necessary that serious physical harm actually result from the overt act, Minn. Stat. § 253B.02, subd. 17(a)(2)(i).

Determining whether Strong is dangerous requires application of a two-part test. The first element focuses on past harm. The state must prove that Strong committed an overt act capable of causing serious physical harm to another. Minn. Stat. § 253B.02, subd. 17(a)(2)(i). Second, the state must prove that "there is a substantial likelihood that [Strong] will engage in acts capable of inflicting serious physical harm on another." *Id.*, subd. 17(a)(2)(ii).

**Past Harm**

*April 23, 2000 – Gethsemane Lutheran Church*

Strong argues that the district court erred by finding that he committed overt acts in furtherance of arson since he was not charged with the crime of arson as a result of this incident. Thus, he asserts that he did not have the intent to commit any overt acts in furtherance of arson.

Officers responded to a complaint from an individual who heard a loud noise and saw juveniles running near a church. When officers entered the church, they observed that oil had been poured on floors, doors, walls, furniture, papers, and on several church robes. Officers found a burned matchstick next to the altar candles and a box of matchsticks in Strong's pocket. The church pastor advised police that church staff do not use matches to light altar candles.

When apprehended, officers noted that Strong smelled of alcohol, and Strong advised them that "God made them do this," that they "had other things planned," that

6

"you don't know who you are messing with," and that "you will get yours." During formal questioning about the incident, Strong claimed not to remember either the events of that day or the comments he made to officers, citing intoxication as the reason for his memory lapse.

Strong does not dispute that he was found inside the church, that he poured oil throughout the church, that he was found with matches in his pockets, or that the burnt match found by police next to the altar candles was Strong's. Strong asserts only that the district court erred by finding that he was there to commit acts in furtherance of arson since he was not charged with arson or attempted arson. But "[c]onviction of a crime is not a prerequisite to commitment as mentally ill and dangerous to the public." *In re Jasmer*, 447 N.W.2d 192, 195 (Minn. 1989). On this record, the district court did not err in ruling that clear and convincing evidence shows that Strong committed overt acts in furtherance of arson.

*July 4 & 22, 2008 – Incendiary Devices*

Strong argues that the record does not support a finding that he attempted to cause serious harm to others when he threw homemade incendiary devices into a crowd of people gathered for a July 4 street celebration and later gave similar devices to young children. When evaluating the overt-act requirement, we focus "on the seriousness of the act and whether it did occur." *Knops*, 536 N.W.2d at 620. The focus is solely on those two questions because the "person's intent or the outcome of the action is not relevant to the determination of whether the conduct meets the overt-act requirement." *In re Civil Commitment of Carroll*, 706 N.W.2d 527, 530 (Minn. App. 2005).

7

On July 4, several officers observed Strong throw incendiary devices into a crowd of people at a street party. Officers agreed that Strong "seemed to be very excited and pleased over the frightened reactions of the people in the crowd," and one officer recalled that the sound of the explosion from Strong's device was "far louder than any fireworks I had heard during the 4th of July weekend." Two eight-year-old girls reported that later that same month, Strong gave them incendiary devices, telling the girls to go light them. Strong threw one of the devices onto a 14-year-old girl's leg as she was sitting near a bonfire. The district court did not err by finding that "[t]he use of such devices in a crowd and the provision of them to young children presented a clear risk of harm."

*July 22, 2008 – Young Females*

Strong challenges the district court's finding that he engaged in overt acts by propositioning underage females because (1) his actions cannot be construed to have constituted an attempt to engage in criminal sexual conduct with them and (2) there was no danger of an actual assault because other adults were in close proximity and would have prevented any attempts.

The 14-year-old female who reported that Strong had thrown an incendiary device on her leg also reported that he "hit" on her by calling her "hot" and "sexy." Officers received written statements from the two eight-year-old girls who he similarly engaged with by calling them "pretty" and telling one girl "he really liked her." When officers searched Strong upon his arrest, they found a jump drive on which he had stored pornographic images of very young females, a digital camera, and several small incendiary devices. Strong had the pornographic images on his person when he engaged

8

in the act of soliciting young females. These facts support the district court's finding that "[t]he solicitation activity constitutes an attempt to engage in criminal sexual conduct with children as young as eight."

*October 2, 2008 – Shooting of C.S.*

Strong does not dispute that he shot his mother, C.S., in the chest and leg but asserts that his actions do not qualify as overt acts because he lacked the intent to inflict serious physical harm upon his mother, his mother suffered no long-term injuries, and the county failed to prove that he was mentally ill at the time of his attack. As noted in *Carroll*, a person's intent does not control whether the act meets the overt-act requirement for dangerousness. 706 N.W.2d at 530; *see, e.g.*, *Jasmer*, 447 N.W.2d at 195-96 (concluding that evidence supported finding of overt act attempting to cause serious physical harm to another when, without justification, person aimed and fired shotgun at a neighbor without caring whether neighbor was hit).

Because intent is not relevant in determining whether Strong's actions constitute overt acts and because Strong concedes that he is mentally ill, the focus is on the acts themselves.[1] C.S. called a county social worker the morning of the incident because she was "really afraid Strong was going to kill [her]." When officers arrived, they observed applesauce and ketchup splattered on the sidewalk, steps, and porch areas. Inside, they

---

[1] Strong urges this court to conclude that the district court erred with regard to the shooting because there was a lack of consensus among medical experts as to whether they considered the shooting an overt act. But "[t]he district court acts within its discretion in determining the credibility of expert testimony, and we defer to those assessments." *In re Civil Commitment of Stone*, 711 N.W.2d 831, 839 (Minn. App. 2006), *review denied* (Minn. June 20, 2006).

9

found the house in disarray, noting that the kitchen table had been tipped over, dishes were broken, and three panes had been broken out of C.S.'s bedroom window. Also inside, officers recovered a .177 caliber Nightstalker pellet gun with a detachable laser light/flashlight unit, a machine-gun-style Airsoft Firepower gun, and an Airsoft Firepower handgun, along with related ammunition.

Strong accused C.S. of "doping him up" by putting medication in his food. Immediately preceding the attack, Strong kicked her bedroom door and told her, "I have something to show you." He then shot her once in the leg with one gun before switching to the laser-assisted gun and shooting her in rapid succession in the chest. During the incident, Strong told her, "It's easier doing it this way." She recalled him going outside and yelling, "[Y]ou should have died." Strong admitted shooting her in the chest, telling officers, "I think I just unloaded the clip." Strong admitted to shooting his mother and rambled about a "violence of action" that he had been trained for in the Army. These facts suggest that Strong believed he was using lethal force, even if in actuality he was only using a pellet gun.[2] As the district court noted:

> If while experiencing a mental illness, Respondent believed he was carrying a weapon capable of deadly force, believed he had a reason to use deadly force on a particular person and did in fact proceed to discharge that perceived weapon in a manner otherwise calculated to cause the death of a person, there is no reason to take this conduct as any less of a threat than a person using a real firearm to shoot at an imaginary

[2] A previous interaction between Strong and police officers reflect that Strong lacks an appreciation of the difference between a lethal gun and the pellet gun used to shoot his mother. On July 6, 2008, officers stopped Strong when they spotted him in public with a black CO2 handgun in a holster on his hip. Strong told officers, "Someday everyone will feel my pain" and compared his holstered gun to the officer's.

threat. Both evidence predisposition to cause serious injury and a lack of restraint when presented with a perceived opportunity to actually cause such harm. Both involve overt acts attempting to cause serious bodily harm.

The record supports a finding that Strong engaged in overt acts attempting to cause harm to C.S., even if she suffered no long-term physical injuries.

**Future Harm**

To satisfy the second element, the state must prove that "there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another." Minn. Stat. § 253B.02, subd. 17(a)(ii). It is appropriate for the district court to consider past conduct in determining the likelihood of future danger. *See Carroll*, 706 N.W.2d at 531 (considering patient's records, which were "replete with documentation of violent outbursts and physical assaults"); *In re Welfare of Hofmaster*, 434 N.W.2d 279, 281 (Minn. App. 1989) (considering patient's entire history of dangerous acts, including a stabbing assault on his wife).

In this case, the district court record contains substantial evidence to support a determination of future danger. Strong's dangerous behavior spanned the course of nearly a decade. Until his appeal, he has consistently denied suffering from a mental illness. In addition, he was deemed unamenable to treatment, resists medication, and readily engages in substance abuse despite its effect on his mental state. His psychiatrist concluded that, without treatment, he will remain fixated on his destructive thoughts with the ability to act on them if released. Another medical expert noted that Strong's writings have become more graphic and violent and have reached a level of concern that Strong

11

would be a danger if released into the general public. Additionally, Strong escaped from confinement when presented with the opportunity and communicated to mental-health professionals that he does not intend to abstain from using mood-altering substances upon release despite those substances making it more likely that he would act on his "delusional belief system."

The record is replete with support to indicate that there is a substantial likelihood Strong, if released, will engage in acts capable of inflicting serious physical harm on another—particularly acts involving the harming of young females. It is of no consequence that he has not yet done so, primarily because "as expressed by [Strong], his primary targets of interest are young girls and this category of victim has not been available to him at the Oak Park Heights Corrections Facility." The district court's conclusion that "[t]here is clear and convincing evidence that because of [Strong]'s manifestation of his schizophrenic illness, there is a substantial likelihood that he will engage in acts capable of inflicting serious physical harm on another" is not clearly erroneous.

**Affirmed.**